UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSCOE GALLMORE,

    Plaintiff,

v.

MATTHEW YORK,
CHRISTIE MLYNARCZYK, and
MELISSA KROT,

    Defendants.

Case No. 2:15-cv-13283
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

# OPINION AND ORDER
## ACCEPTING IN PART MAGISTRATE JUDGE'S RECOMMENDATION [30] AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [26]

Excessive-force cases often involve two competing accounts of what happened: one by the arresting officers and the other by the plaintiff. This excessive-force case is rare. Like the typical case, it involves two competing accounts of what happened. But unlike the typical case, it is the plaintiff who has provided competing accounts.

In the hours and days after Dearborn police arrested him for robbery, Plaintiff Roscoe Gallmore said that when he was fleeing the crime scene, he fell down a hill, hit his shoulder on a tree stump, and then fell into a river at the bottom of the hill. But nearly two years later, Gallmore filed this lawsuit asserting that Dearborn police officer Matthew York struck him with a nightstick in the arm, kicked him in the same arm, used a racial slur, dragged him to the water, and threw him in, all while officer Christie Mlynarczyk watched. Gallmore additionally claims that at the police station, Dearborn detective Melissa Krot denied him medical care for his broken arm.

The three defendants seek summary judgment. In deciding that motion, the Court is not permitted to assess Gallmore's credibility. But the Court is tasked with deciding whether any rational jury could find for Gallmore. As will be explained, the Court does not believe that a reasonable jury, considering the record now before the Court, could find York struck Gallmore with a nightstick and threw him the water while Mlynarczyk looked on. The Court additionally finds that while perhaps Krot should have realized that Gallmore needed more prompt medical attention for his broken arm, she, personally, did not come to that realization. So no reasonable jury could find she was deliberately indifferent to Gallmore's serious medical needs.

## I.

When, as here, a defendant moves for summary judgment, the Court typically presents the plaintiff's account of what happened along with what the defendant says occurred if it is consistent with the plaintiff's account. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But given the atypical summary-judgment record, the Court begins with the story told by two videos and Defendants' other evidence.

### A.

#### 1.

At 6:25 p.m. on November 21, 2013, Dearborn dispatch received a 911 call from a Red Roof Inn (the one at Telegraph Road and Michigan Avenue, to be precise). (R. 32, PID 253, 350.) Jim (to preserve anonymity) told the police that he had been robbed of around $200 just five to ten minutes earlier. (R. 32, PID 351–52.) Jim described the suspect and the dispatcher broadcasted the description to "units making the Red Roof." (R. 32, PID 352–53.)

Before the call was even over, two Dearborn police officers had arrived at the hotel. (*See* R. 32, PID 254, 354.) One officer, according to his police report, "went in the direction the

2

[suspect] was last seen running." (R. 32, PID 254.) As he walked across the parking lot, he reportedly found "an opening into a wooded area." (*Id.*) The area "ha[d] a steep slope and drop[ped] directly into the Rouge River." (*Id.*) The officer radioed that the suspect may have exited onto Telegraph Road. (*Id.*)

Just after 6:35 p.m., two other Dearborn police officers—Defendants York and Mlynarczyk—saw someone matching the broadcasted description walking on Telegraph just north of Michigan. (*See* R. 32, PID 254, 256; York Video at 6:35:50 p.m.) The man was later identified as Gallmore.

According to York's police report, as the two officers exited their vehicle, York could see that Gallmore's clothes were "soaking wet." (R. 32, PID 256.) York wrote in his report, "Although it was raining, the wetness of the clothing was more consistent with someone that was submerged in water." (R. 32, PID 256.) A video from York and Mlynarczyk's vehicle shows that Gallmore's pants were soaked through. (York Video at 6:35:50 p.m.) According to York's report, York asked Gallmore where he had been coming from and Gallmore said "'I am coming from,' . . . 'I'm the one that did it.'" (*Id.*) After York asked what Gallmore had done, Gallmore reportedly said "I'm the one you're looking for. I robbed those people." (*Id.*) York "immediately placed Gallmore in handcuffs." (*Id.*)

Within six minutes of locating Gallmore, York had secured Gallmore in the back of his police car. (*See* York Video at 6:41:25 p.m.) Gallmore told York, "I think I broke my arm[.]" (R. 32, PID 267; York Video at 6:43 p.m.) York responded, "Seriously?" (*Id.*) Gallmore: "Yeah, I think. I don't know. . . It might just be swollen or something. I don't know." (*Id.*)

A few minutes later, York drove Gallmore to the Dearborn police station. During the drive, York asked about the robbery. Gallmore stated, "I just said, 'I need the money.' . . . The

3

guy gave it to me and I ran." (R. 32, PID 267; York Video at 6:50 p.m.) As their conversation continued, York asked, "What happened when you took off running?" Gallmore responded, "I fell down in that damn water." (R. 32, PID 269; York Video at 6:51 p.m.)

**2.**

At the Dearborn police station, Gallmore was interviewed by a Dearborn detective, Defendant Krot. The interview was captured on video.

Near the start of the interview, Krot asked Gallmore if he was "ok." (R. 32, PID 279; Krot Video at 8:44 p.m.) After Gallmore said, "Yeah," Krot asked, "What's going on?" (*Id.*) Gallmore stated, "I think my arm is broke" and Krot asked to look at Gallmore's arm. (*Id.*) Having briefly examined Gallmore's arm, Krot opined, "It looks okay. But if you're still having some more problems in a little bit, we'll see about getting an ambulance here to look at you." (*Id.*)

Krot then began to question Gallmore about the robbery. Gallmore explained that he was told that if he got a night job, he would not be able to stay at his homeless shelter. (R. 32, PID 289.) This really "frustrated" Gallmore and made him feel like he "wanted to go back to jail." (R. 32, PID 289–90.) Gallmore went to downtown Detroit and "d[id] some crack." (R. 32, PID 290.) Gallmore explained that because "they won't do nothing for me," he "[m]ight as well start back using drugs." (R. 32, PID 290–91.)

Gallmore told Krot that he then took a bus from Detroit to Dearborn, going past Telegraph a "couple miles" so that he could walk and "cool . . . down." (R. 32, PID 291.) Gallmore continued, "I went up in that Red Roof—I didn't go up in there to rob anybody. I was just—just walking." (R. 32, PID 291.) Gallmore explained that he approached an older couple parked in the hotel's lot and insisted that the man give him money: "I said, 'Sir, I can't be asking

4

too many more times. I need some money because I'm on drugs and I need some drugs to support my habit.' And he said—he reached in his pocket and said, 'Here, that's all I got.' And it was Canadian money." (R.32, PID 293; *see also* PID 292, 296–97.)

Gallmore explained to Krot that after he got the money, the man started the car and pulled out. (R. 32, PID 295.) Gallmore told Krot: "I was just like riding on the side of the car. He started and I jumped off and ran." (R. 32, PID 295; Krot Video at 8:59 p.m.) Gallmore ran toward the river. (R. 32, PID 304; Krot Video at 9:08 p.m.) Gallmore explained, "I fell down the hill. I fell down the hill. I fell into the river." (R. 32, PID 305; Krot Video at 9:08 p.m.)

At the end of the interview, Gallmore again referenced his arm: "Ow." (R. 32, PID 332.) Krot stated, "You probably twisted it pretty damn good." (*Id.*) Gallmore agreed: "Yeah. It's not broke. It's probably just twisted." (*Id.*) Krot opined, "Yeah. It doesn't really look broke, no." (*Id.*)

**3.**

As it turned out, both Gallmore and Krot were wrong about the arm. The next day, November 22, 2013, Gallmore was brought to the hospital. (R. 32, PID 377.) Whether intentional or not, Defendants have only supplied the Court with limited hospital records. But from what the Court has, it is plain enough that Gallmore underwent surgery to repair a fractured left arm. (*See* R. 26, PID 156; R. 28, PID 185; R. 34, PID 368.) Indeed, an x-ray labeled "L proximal humerus fracture" appears to show a mental plate secured with nine screws. (*See* R. 28, PID 185; R. 34, PID 368.)

During his two-plus days in the hospital, Gallmore told medical providers about his injury. (R. 26, PID 155.) A nurse noted, "[Patient] states 'Well I was running I fell into a tree or something. I was running from some people I stole some money and fell.'" (R. 26, PID 155.) A

5

nurse practitioner noted, "Fell while running, left shoulder landed on tree stump." (R. 26, PID 156.)

**4.**

In March 2014, a jury found Gallmore guilty of armed robbery and assault. (R. 26, PID 151.)

**B.**

Gallmore's sworn complaint nearly two years after the incident and his affidavit submitted in response to Defendants' motion for summary judgment tell a very different story.

**1.**

At around 4:30 p.m. on November 21, 2013, Gallmore received a call from a friend. (R. 28, PID 182.) The friend said he had just "stumbled over some stuff" and asked Gallmore to meet him at Michigan Avenue and Middlebelt Road in Dearborn. (*Id.*)

Gallmore obliged. The two friends walked about three blocks to a building. (R. 28, PID 182.) As they went into the building Gallmore "saw and took pictures of 185 lbs of C-4, and 1,300 lbs of [d]ynamite." (*Id.*) Gallmore also found paperwork indicating that the building was going to be taken down. (*Id.*) The two friends departed the building and headed in different directions. (R. 28, PID 183.)

Around 5:00 p.m. (or a little later), as Gallmore was walking down Telegraph toward Michigan Avenue, York and Mlynarczyk pulled up in their police vehicle. (R. 1, PID 3; *see also* R. 28, PID 183 (stating that Gallmore spent 20 minutes in the building).) York asked Gallmore where he was coming from. (R. 1, PID 3.) Gallmore replied a "restaurant." (R. 1, PID 3; R. 28, PID 183.) The two officers then looked at Gallmore as though he were lying. (R. 1, PID 3; R. 28, PID 183.)

6

At this point, Gallmore avers, York decided to beat him. In particular, York instructed Gallmore to follow him and indicated that Gallmore should walk behind a building. (R. 1, PID 3.) Gallmore says, "Shortly after [York] ordered me to stop he pulled out his nightstick striking me several times with powerful blows on my left arm." (R. 1, PID 3, 5.) After Gallmore collapsed to the ground, York kicked Gallmore in the same arm. (R. 1, PID 5; R. 28, PID 183.) Gallmore avers, "During this attack, Officer York stated verbatim, 'We're tired of you niggers coming to Dearborn. . . .'" (R. 1, PID 5; R. 28, PID 183.)

Then, Gallmore says, "York proceeded to drag me to a nearby lake (unidentified body of water), subsequently throwing me into the body of water." (R. 1, PID 5; *see also* R. 28, PID 183 ("drug me to a hill and into a water area").) Gallmore told York and Mlynarczyk that he could not swim. (R. 28, PID 183.) Gallmore spent about 35 or 40 minutes in the water. (R. 1, PID 5; R. 28, PID 183.) By the time he exited, York and Mlynarczyk were gone. (R. 1, PID 5; R. 28, PID 183.) Gallmore then began walking north on Telegraph toward Warren Road. (R. 28, PID 182; *see also* R. 1, PID 5.)

Gallmore's verified complaint and his summary-judgment affidavit do not entirely agree on what happened next. In his complaint, Gallmore avers, "As I was walking I was stopped by *another* police squad car. The *officer* questioned my direction and advised me that someone had just reported a robbery and that I had to be taken into custody." (R. 1, PID 5 (emphases added).) But in his affidavit, Gallmore avers that as he was walking, "*York and Mlynarczyk* stopped their car got out and asked me where I was coming from and I told them Toys-R-Us. I was advised by both defendants York and Mlynarczyk that someone got robbed." (R. 28, PID 183 (emphasis added).) Whether by York and Mlynarczyk or a different officer, Gallmore was arrested and brought to the police station. (R. 1, PID 5; R. 28, PID 183.)

7

**2.**

When Gallmore arrived at the Dearborn police station, he "complained to several officers about the pain [he] was experiencing in [his] left arm. The officer[s] had awareness of [Gallmore] being assaulted by officer York." (R. 1, PID 5; *see also* R. 28, PID 183.) Gallmore avers, "I clearly asserted to Officer Krot that I was assaulted by Officer York and that my left arm was in unbearable pain." (R. 1, PID 6.) Gallmore also informed York and Mlynarczyk that "[he] was injured and [he] needed medical attention." (R. 28, PID 183.) "Instead of escorting me to the hospital," Gallmore says, "I was left in the holding cell for three days." (R. 1, PID 5; *see also* R. 28, PID 183.) Ultimately, a "shift commander" ordered that Gallmore be brought to the hospital. (R. 28, PID 184.)

**C.**

In September 2015, approaching two years after the robbery, Gallmore filed this lawsuit. (R. 1, PID 5.) Gallmore claims that York and Mlynarczyk used force prohibited by the Fourth Amendment. (*See* R. 1, PID 3; R. 28, PID 174.) He also claims that by denying him medical care while he was a pretrial detainee, Krot violated his rights under the Fourteenth Amendment. (*See* R. 1, PID 3, 6; *see generally* R. 34.)

All pretrial matters, including Defendants' motion for summary judgment, were referred to Magistrate Judge Stephanie Dawkins Davis. She makes two recommendations: that the Court grant summary judgment in favor of Krot and that the Court deny York and Mlynarczyk summary judgment. (R. 30.)

Gallmore objects to the first recommendation (R. 34); York and Mlynarczyk, the second (R. 32.)

**II.**

As the parties have effectively objected to all of the Magistrate Judge's report, the Court will address summary-judgment anew. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**III.**

The Court begins with York and Mlynarczyk's argument that no reasonable jury could find that York used excessive force while Mlynarczyk acquiesced. The Court then turns to Krot's argument that she was not deliberately indifferent to Gallmore's serious medical needs.

**A.**

Although York and Mlynarczyk make some questionable arguments about sham affidavits and hypothetical newscasters, their bottom line is that Gallmore's account as set out in his affidavit is implausible and that taking the record as whole, no reasonable jury could find for Gallmore. (*See* R. 32, PID 236–37, 239–40; R. 26, PID 120.) The Court agrees that the account Gallmore has set out in his verified complaint and affidavit is implausible.

Before explaining why, the Court must first explore whether it is even permitted to make that determination. The Court is well aware that juries, not judges, determine the credibility of witnesses. *See Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). But it is equally true that when a party moves for summary judgment, the judge's job is to decide whether there is a genuine dispute for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And this Court would be doing that job poorly if it required six to eight people to spend a week in a jury box when there is only one rational result. *See Matsushita*, 475 U.S. at

587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"); *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) ("[T]here must be evidence on which the jury could reasonably find for the plaintiff."). Indeed, on facts strikingly similar to those in this case (more on that below), the Second Circuit explained: "[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' *Anderson*, 477 U.S. at 252, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). So this Court does have "some discretion to determine whether [Gallmore's] claim is implausible." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir. 1996) (internal quotation marks omitted).

There are at least four reasons why no reasonable jury could credit the account Gallmore has set out in his verified complaint and affidavit.

First, Gallmore's litigation account is questionable in its own right. In his sworn complaint, Gallmore says that after York threw him in the river, "another" officer (one other than York and Mlynarczyk) arrested him. (R. 1, PID 5.) But then in his affidavit, Gallmore says York and Mlynarczyk arrested him. (R. 28, PID 183.) The affidavit is consistent with the video evidence, so, perhaps, Gallmore just made a misstatement in his complaint. But even granting that, Gallmore says in his affidavit that after he got out of the river, he began walking on Telegraph when "York and Mlynarczyk stopped their car got out and asked me where I was coming from." (R. 28, PID 183.) But why would York ask Gallmore where he was coming from if, according to the same affidavit, York had thrown him in the river just a bit earlier?

Second, Gallmore's litigation account of the events is difficult to reconcile with undisputed (and likely indisputable) evidence. Gallmore robbed Jim sometime around 6:15 p.m. Yet Gallmore claims he first ran into York and Mlynarczyk around 5:00 p.m. or a bit after. Gallmore's sworn complaint and affidavit also say that he was kept in a holding cell for three days before he received treatment for his arm injury. (R. 1, PID 5; R. 28, PID 183–83.) But medical records show he was brought to the hospital the day after his arrest and he remained there for at least two days. (R. 35, PID 377; R. 26, PID 155–58.)

Third, consider that the interaction between York and Gallmore as captured on video is not what one would expect between an attacker and his victim. As York places Gallmore in the car, he tells Gallmore that he will try to turn on the heat soon. (York Video at 6:41:20 p.m.; R. 32 PID 265.) And York asks Gallmore if his handcuffs are too tight and if they are "hurting." (York Video at 6:43:30 p.m; R. 32, PID 266.) And the video shows that on the drive to the station, Gallmore is not angry or upset with York. (*See* York Video at 6:50:20 to 6:59 p.m.) Gallmore even laughs at one point. (York Video at 6:51:50 p.m.)

All of that said, the strongest reason for concluding that a jury could not credit Gallmore's litigation account are Gallmore's own words. While in York's police vehicle, Gallmore told York, "I think I broke my arm." (York Video at 6:44:10 p.m.; R. 32, PID 267.) But if York hit Gallmore in the arm with a nightstick, Gallmore would have said "I think *you* broke my arm." Gallmore also told York that after he took off running, "I fell down in that damn water." (York Video at 6:51:50 p.m.; R. 32, PID 269.) And in his interview with Krot, Gallmore stated, "I fell down the hill. I fell into the river." (Krot Video at 9:08 p.m.; R. 32, PID 305.) During the interview, Gallmore never mentioned that York (or any officer for that matter) used any improper force, let alone an unprompted strike with a nightstick. Then, the next day,

11

Gallmore went to the hospital and told a nurse, "'I was running I fell into a tree or something. I was running from some people I stole some money and fell.'" (R. 26, PID 155.) A nurse practitioner also noted, "Fell while running, left shoulder landed on tree stump." (R. 26, PID 156.) So no less than three times shortly after the incident did Gallmore say that he fell in the water. And Gallmore told medical personnel that he injured his arm when he fell and struck a tree. Yet almost two years later, Gallmore claims that York struck him in the arm and threw him in the river.

Gallmore offers no credible reason for changing his story. He does make a conclusory claim that the police used his injuries to "gain unsworn statements from [him] under duress." (R. 28, PID 184.) True, Gallmore had smoked crack earlier in the day, was diabetic and had low blood sugar, had a broken arm, and had just gone through a harrowing event. But Gallmore indicated to Krot that drugs were not preventing him from recounting the incident. (R. 32, PID 283–84.) And Krot gave Gallmore candy for his blood sugar. (R. 32, PID 282, 284.) Further, Gallmore laughed during the interview (Krot Video at 9:08:07 p.m.; R. 32, PID 304), the two listened to music, and Gallmore remarked that he liked Kid Rock, the Dixie Chicks, and Reba McEntire (Krot Video at 9:14:30 p.m.; R. 32, PID 312). Gallmore also told Krot a lot about his personal history and, at one point said, "I'm having a nice time talking to you." (Krot Video at 9:29:07; R. 32, PID 324.) None of that suggests duress. Based on a review of the video, it is not plausible that Gallmore was confused about the very basic aspects of his arrest: Was it a fall into a tree or a strike by a nightstick? Was it a fall into the river or being dragged to the river and thrown in? Finally, even if a jury could think that Gallmore was confused when he spoke with York and Krot, that would not explain Gallmore's next-day confession to medical providers.

In sum, the allegations of excessive force set forth in Gallmore's complaint and affidavit are questionable standing alone, they are very difficult to reconcile with undisputed evidence, and they are flatly contrary to Gallmore's own more contemporaneous statements said three times over. Thus, no reasonable jury could credit Gallmore's later version of the events. *See Anderson*, 477 U.S. at 252.

This conclusion is not only supported by general, summary-judgment principles and the record in this case, it is supported by a grant of summary judgment in a case with very similar facts.

In *Jeffreys v. City of New York*, police officers caught Jeffreys in the midst of burglarizing a classroom on the third floor of a school. 426 F.3d 549, 551 (2d Cir. 2005). The incident largely ended when Jeffreys awoke on the ground three stories below. *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 470 & n.10, 471 (S.D.N.Y. 2003). On the day of the incident, Jeffreys told medical personnel that he had "jumped three stories"; two days after the incident, Jeffreys told police that he "attempted to flee out of the classroom window, lost his footing and fell to the concrete below"; and nine days after the incident, Jeffreys told the department of corrections that he had "jumped out [of a] 3rd floor window." *Id.*

Many months later, Jeffreys changed his story and filed suit against the responding officers based on his new account. *See Jeffreys*, 275 F. Supp. 2d at 470 & n.10, 471. Via testimony and affidavit, Jeffreys claimed that when he was in the classroom, a police officer entered, shined a flashlight in his face, and then struck him several times with the flashlight, including strikes to his head. 426 F.3d at 551; 275 F. Supp. 2d at 466–67, 476 n.19. He further stated that other officers entered the classroom and joined in the beating. 426 F.3d at 551; 275 F. Supp. 2d at 466–67. At some point, Jeffreys averred, he lost consciousness and, when he awoke,

he was on the pavement outside. 426 F.3d at 551. Jeffreys thus implied that one of the officers had thrown him out the window. *Id.*; 275 F. Supp. 2d at 467.

Again, this case is a lot like *Jeffreys*. There, the plaintiff's litigation position was developed many months after his arrest and was contrary to his three, more contemporaneous accounts. 426 F.3d at 552. So too here. There, although more strongly than here, the plaintiff's account was inconsistent with other undisputed evidence of record. *See id.* at 552–53. And there, like here, none of the possible reasons for the plaintiff changing his story were credible. *See* 275 F. Supp. 2d at 475 n.17 (finding claim of "coercion" unsupported). In the end, the Second Circuit found that Jeffreys' testimony "was so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." *Id.* at 555 (internal quotation marks omitted); *see also Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) (citing *Jeffreys* with approval). This Court reaches the same conclusion about Gallmore's complaint and affidavit.

In short, this is that "rare" case where no rational jury could credit the account the plaintiff sets forth in his affidavit and sworn complaint. And absent that evidence, no reasonable jury could find that York used excessive force while Mlynarczyk acquiesced.

**B.**

The Court thus turns to Gallmore's claim that Krot failed to provide him prompt treatment for a serious medical need in violation of the Fourteenth Amendment. While close, the Court finds that on the present record, no reasonable jury could find for Gallmore on this claim.

The Court begins with the law, which, as it turns out, is somewhat unsettled. Pretrial detainees have a right to treatment for serious medical needs under the Fourteenth—not the Eighth—Amendment. *See Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). But until fairly

recently, it was settled that in deciding whether a pretrial detainee's right to medical treatment was infringed, courts were to apply the standard that governs analogous Eighth Amendment claims brought by convicted prisoners. *See Richmond v. Huq*, — F. 3d —, No. 16-2560, 2018 WL 1417546, at *4 n.3 (6th Cir. Mar. 22, 2018). That Eighth Amendment standard is comprised of both an objective component and, critical to this case, a subjective component. *Baynes*, 799 F.3d at 618. But in 2015, the Supreme Court held that where a pretrial detainee brings an excessive-force claim, the detainee need only make an objective showing. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) ("pretrial detainees (unlike convicted prisoners) cannot be punished at all"). Although the Sixth Circuit "has not yet considered whether *Kingsley* similarly abrogates the subjective intent requirement of a Fourteenth Amendment" inadequate-medical-care claim, in a recent, published opinion it "recognize[d]" that *Kingsley* "calls into serious doubt whether [a plaintiff] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them." *Huq*, 2018 WL 1417546, at *4 n.3; *see also Johnson v. Clafton*, 136 F. Supp. 3d 838, 843–44 (E.D. Mich. 2015) (discussing potential effect of *Kingsley*).

In this case, the Court proceeds under the presumption that *Kingsley* did not change the standard governing claims of constitutionally inadequate medical care brought by pretrial detainees. The Magistrate Judge thought the Eighth Amendment applied and Gallmore has not argued otherwise in his objection. (*See* R. 30, PID 216–17; R. 34, PID 364–65.) And no party has ever mentioned *Kingsley*, so this Court lacks the benefit of briefing on the issue. Further, the Sixth Circuit has applied the Eighth Amendment standard to inadequate-medical-care claims brought by pretrial detainees even after *Kingsley*. *See e.g.*, *Huq*, 2018 WL 1417546, at *3–4; *Baynes*, 799 F.3d at 617–18.

So to proceed to trial, Gallmore must show that a reasonable jury could find both an objective and a subjective component satisfied. "To satisfy the objective component, [Gallmore] must show the existence of a sufficiently serious medical need." *Baynes*, 799 F.3d at 618. As for the subjective component, Gallmore must show that Krot was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" *and* that she "dr[e]w the inference." *Id.* (internal quotation marks omitted).

Gallmore objects to the Magistrate Judge's finding that he cannot satisfy the objective component. (R. 34, PID 364.) The objection seems well-founded. (In the light most favorable to Gallmore, he had a fractured humerus surgically repaired with a metal plate and screws.) Even so, the Court need not sustain the objection. As explained next, the Court finds that no reasonable jury could find that the subjective component of Gallmore's inadequate-medical-care claim satisfied.

To be sure, a reasonable jury could find that Krot was "aware of facts" from which she could have inferred that Gallmore needed prompt medical care for his injured arm. *See Baynes*, 799 F.3d at 618. According to Gallmore's affidavit, he "clearly asserted" to Krot that York had assaulted him and that his left arm was in "unbearable pain." (R. 1, PID 6.) And the video shows Gallmore telling Krot, "I think my arm is broke" and demonstrating difficulty moving the arm. (Krot Video at 8:44 p.m.; R. 32, PID 279.) It also shows that Gallmore did not use his left arm during the entire interview. At one point, Gallmore even struggles to put a blanket over his shoulders because he could only use his right arm to do so. (Krot Video at 9:35 p.m.; R. 32, PID 328.) And Krot apparently needed to open Gallmore's candy for him because of Gallmore's inability to use both hands. (Krot Video 8:58 p.m.; R. 32, PID 292.) So a reasonable jury could find that Krot was aware that Gallmore was both in pain and had virtually no use of his left arm.

16

But it is not enough that Krot was aware of facts that permitted her to draw the inference that Gallmore needed prompt medical treatment. Instead, it must be the case that Krot, personally, drew that inference (and then chose not to provide it). *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (providing that a prison official would not act with deliberate indifference if she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"); *Baynes*, 799 F.3d at 618.

A reasonable jury, having watched the video of Krot's interview of Gallmore, could not find that Krot herself inferred that Gallmore's arm injury required prompt medical treatment. The video shows that when Gallmore says his arm is broken, Krot expresses concern, examines Gallmore's shoulder area, and then concludes, "It looks okay." (Krot Video at 8:44 p.m; R. 32, PID 279–80.) Krot's statement strongly suggests that in her mind, Gallmore's injury did not require medical attention at that moment. Indeed, she tells Gallmore: "But if you're still having some more problems in a little bit, we'll see about getting an ambulance here to look at you." (Krot Video at 8:44 p.m.; R. 32, PID 279–80.) At the end of the interview, when Gallmore states "[o]w," Krot comments, "[y]ou probably twisted it pretty damn good." (Krot Video at 9:45 p.m.; R. 32, PID 332.) After Gallmore agrees that it is "probably just twisted," Krot states, "Yeah. It doesn't really look broke, no." (Krot Video at 9:45 p.m.; R. 32, PID 332) So again, in Krot's mind, Gallmore had an injury that might resolve without medical attention or, at least, could wait a while for medical attention.

The video also shows that Krot was sensitive to Gallmore's other needs. When Gallmore says he was diabetic and his blood sugar was low, Krot gets Gallmore water and candy. (Krot Video at 8:47 p.m.; R. 32, PID 282.) She also gets Gallmore a blanket to make him more comfortable. (Krot Video at 8:49 p.m.; R. 32, PID 284.) She puts on music Gallmore likes. (Krot

17

Video at 9:14 p.m.; R. 32, PID 312–13.) These actions undermine the notion that Krot came to the conclusion that Gallmore needed prompt medical attention but then decided not to provide that care.

In sum, while a reasonable jury could find that during or after the interview, Krot should have drawn the inference that Gallmore needed prompt medical care, it could not find that Krot in fact drew that inference. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

Although this finding almost completely addresses Gallmore's inadequate-medical-care claim, there are two loose ends. One involves the time before and after his interview. Gallmore arrived at the police station about 7:00 p.m. and was not interviewed by Krot until about 8:45 p.m. (York Video at 6:59 p.m.; Krot Video at 8:43 p.m.) And Gallmore's interview with Krot ended at about 9:45 p.m. and Gallmore was brought to the hospital until around 1:30 p.m. the next day. (*See* Krot Video at 9:46 p.m.; R. 35, PID 377.) But there is nothing in the record to indicate that Krot acted with deliberate indifference during these times.

In his verified complaint, Gallmore merely says, "After being processed . . . and booked I clearly asserted to Officer Krot that I was assaulted by Officer York and that my left arm was in unbearable pain. Despite her awareness of my medical needs, she denied my request leaving me in the holding cell." (R. 1, PID 5.) And in his affidavit, Gallmore even more generally states, "In the precinct[,] Plaintiff Gallmore advised defendants York, Mlynarczyk and Krot that I was injured and I needed medical attention." (R. 28, PID 183.) In light of Krot and Gallmore's interactions captured on video, these general descriptions of complaints are insufficient for a jury

18

to find that Krot was deliberately indifferent to Gallmore's arm pain before or after their interview.

The other loose end requires pinning down who Gallmore claims denied him constitutionally required medical care. Krot to be sure. But in his complaint, Gallmore says he complained to "several officers" at the station about his arm pain. (R. 1, PID 5.) He also says that while other "officers" denied him medical care, he listed Krot "as a separate defendant" because she lied under oath. (R. 1, PID 6.)

Still, a fair reading of Gallmore's complaint is that he sued only Krot for denying him medical treatment. He specifically named her in both the "statement of claims" and "relief" sections of his complaint. (R. 1, PID 3–4.) In his "statement of facts" pertaining to his medical-treatment claim, he repeatedly faulted Krot and did not mention York, Mlynarczyk, or another officer by name. (R. 1, PID 6.) In moving for summary judgment, Defendants twice stated that Gallmore had sued Krot for inadequate medical care. (R. 26, PID 120, 123.) Gallmore did not directly dispute this in his response brief. True—in the fact section of his brief—he echoed his affidavit: "In the precinct Plaintiff Gallmore advised defendants York, Mlynarczyk and Krot that I was injured and I needed medical attention. I was then told by defendants and several other officers that there was nothing wrong with me." (R. 28, PID 174.) But Gallmore has never attempted to make any argument about York's or Mlynarczyk's state of mind. For instance, Gallmore has not addressed the fact that although he told York that his arm was broken, he also told York that "[i]t might just be swollen or something" and that his pain was "[p]robably about six, seven." (York Video at 6:44 p.m.; R. 32, PID 267.) Accordingly, the Court does not believe that Gallmore has adequately raised an inadequate-medical-care claim against York or Mlynarczyk.

19

In sum, Krot is entitled to summary judgment on Gallmore's claim that she denied him constitutionally required medical attention.

## IV.

The Court ACCEPTS the Magistrate Judge's recommendation to grant summary judgment in favor in Krot. The Court declines to adopt her report. Instead, for the reasons provided in this opinion, the Court GRANTS Defendants' motion for summary judgment.

SO ORDERED.

Dated: April 11, 2018

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 11, 2018.

s/Keisha Jackson  
Case Manager